Filed 6/28/21  Chmait v. Heritage Asset Management CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| OMAR CHMAIT, | |
| Plaintiff and Appellant, | G057374 |
| v. | (Super. Ct. No. 30-2014-00745712) |
| HERITAGE ASSET MANAGEMENT, INC., et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Martha K. Gooding, Judge.  Reversed and remanded with instructions.

Cedar Adams and Adam K. Obeid for Plaintiff and Appellant.

Estes Law Group and Polly J. Estes for Defendants and Respondents.

**INTRODUCTION**

Today we hold that the wind up of a general partnership actually requires winding up the partnership business.  A wind-up cannot be completed by way of a self-dealing conversion of partnership assets by some of the partners, to the detriment and without the consent of the other partner or partners.  Where such a conversion occurs, the partnership remains in existence, and the other partner is owed commensurate damages and a proper accounting.  Because the trial court reached a contrary conclusion after a bench trial, we reverse and remand for further proceedings.

## FACTS[1]

In 2013, Rima Radwan was working in the student loan consolidation business for a company called Student Loan Managers.[2]  Student Loan Managers' business consisted of approaching student loan debtors and helping them to consolidate their loans in order to lower their monthly payments.  If the company could convince a borrower to consolidate, it would collect certain fees for servicing and managing the loan over its decades-long life.

Over time, Rima and her colleagues recognized the highly lucrative business opportunity in student debt consolidation.[3]  She and her brother, Mazen Radwan, and a family friend, appellant Omar Chmait, decided to start a competing student loan consolidation business.  At Omar's request, Rima and Mazen agreed to bring in Omar's long-time best friend, Dean Robbins, as a partner.  In August 2013, the four of

---

[1]    Neither side disputes the trial court's factual findings so we glean this section mainly from the trial court's corrected final statement of decision and the parties' joint list of stipulated facts.  As the judgment is largely based on the trial court's conclusions of law, we are governed by the de novo standard of review rather than substantial evidence.  (See *Enea v. Superior Court* (2005) 132 Cal.App.4th 1559, 1563 (*Enea*).)  Thus, we need not consider respondents' contention that appellant waived any substantial evidence objection to the factual findings under *County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1273.

[2]    We shall adopt the nomenclature of the trial court in referring to the individual parties in the case by their first names – not out of informality, but, in the trial court's words, for purposes of "convenience and clarity, as two of the parties share a common last name."

[3]    According to appellant's expert, student loan debt has grown considerably in the past decade or so, and a significant percentage of these borrowers are delinquent on their loans.  This creates a demand for student loan consolidation services like those provided by the business entities in this case.

them formed a general partnership by oral agreement and decided to use the name Student Loan Service Managers (SLS Managers).[4]

*The Partnership*

The partnership's business was to run a telemarketing/call center doing the same thing as Rima's former employer – convincing student loan debtors to consolidate multiple student loans and lower their monthly payments using federal government programs. Once the loans were consolidated, each borrower would have only one loan with one lower monthly payment over a 20- or 30-year period. SLS Managers would process the customer's payments and in return, the customer would pay the partnership an initial sign-up fee plus a residual monthly fee for the life of the consolidated loan. The partnership's profit-generating potential thus lay in its customer agreements.

The four partners decided they would each take an equal stake in the business, 25 percent, and would share in its profits and losses. They would also share equally the ownership of partnership assets and partnership business opportunities. Decisions of the partnership were to be made by majority vote and each partner was to bring something to the table in exchange for their 25 percent interest.

Rima, having taken forms and other documents from her former employer, was to bring her industry knowledge to bear to help do the back-office work for the business, processing the consolidations and other administrative tasks. Mazen was to provide starting capital to get the business off the ground. Dean had computer skills, so he was in charge of creating the partnership's customer relationship management (CRM) software – ultimately named Lazarus – to help manage the customer data and accounts. He would provide ongoing technical support as well.

Omar was a fledgling restaurateur, having opened a Mediterranean restaurant in San Juan Capistrano earlier that year. He also had experience managing a

---

[4] The similarity to Rima's former employer's name is not lost on us.

3

telephone call center, so they agreed he would manage the call center floor and do the "front office" work. He agreed to work at SLS Managers during the day and then go to work at his restaurant in the evenings. As part of his contribution to the business, Omar was to lease office space, obtain a list of leads, contract with a payment processor (which turned out to be Payment Automation Network (PAN)), hire and manage the call center employees, maintain the partnership's financial records, and help with revising forms Rima had taken from Student Loan Managers.[5] Omar did most of these things, but sometimes not in a satisfactory manner.[6]

The business opened its doors in August 2013. By early 2014, however, Rima, Mazen, and Dean were growing more and more concerned about Omar's performance. They felt he was not adequately contributing to the business. At a January 2014 meeting, Omar admitted he had not been performing up to par, and they decided to make some changes to try to help him improve. They moved his office and cut down his responsibilities.

These changes did not work, so on February 5, 2014, Rima, Mazen, and Dean sat Omar down and told him he could choose one of two options. First, he could walk away from the partnership completely and take a 5 percent share of partnership profits in perpetuity. Or he could remain a partner, but with a reduced 10 percent stake. If he improved his performance and earned the right to 25 percent, they would restore his equal share to him. Omar refused both options, because he did not think they had the

---

[5]     While the trial court characterized Rima as "bring[ing]" forms from Student Loan Managers, it is difficult for us to see how this "bringing" did not constitute out-and-out misappropriation of her former employer's proprietary information. We have no evidence in the record that Rima had Student Loan Managers' permission to take these documents, let alone use them as forms for a competing business. Indeed, the evidence is to the contrary.

[6]     One area of focus at trial, and in the statement of decision, was Omar's nonfeasance or malfeasance as a partner – that he failed to timely hire a payment processor, failed to change the company name in Rima's forms, failed to obtain workers' compensation insurance, poorly managed the books and employees, and frequently showed up late to work, amongst other transgressions. We need not get into the details of these episodes because they are largely irrelevant to the question before us. For purposes of appeal, Omar himself does not seem to dispute they occurred.

right to unilaterally reduce his partnership stake. Instead, he ignored the conversation and kept working at SLS Managers as if it had not occurred.

*Formation of D.O.R.M., Inc.*

From the beginning, the partners' intention was to eventually conduct business under the auspices of a limited liability entity, but the necessity became more acute in late 2013. Student Loan Managers, Rima's former employer, learned she had used its forms to solicit customers for SLS Managers. It had its attorney send the partners a cease and desist letter in late October 2013. Faced with an actual threat of litigation, the partners formed an S-corporation called D.O.R.M. Group Inc. (DORM) in early 2014.[7] Aside from setting up a bank account for DORM and filing its articles of incorporation, however, no other corporate formalities were observed until June 2014, and DORM was – for lack of a better term – relatively dormant until then.[8]

*Omar is Expelled from the Partnership*

On March 7, 2014, about a month after they had told Omar his stake in the partnership was reduced, Rima, Mazen, and Dean were very perturbed to discover Omar had just printed two copies of the partnership's customer list. Believing he was stealing the data in order to start a competing business, they locked him out of the company computers and told him he was terminated from the partnership.[9] They took away his management duties and purported to take away his ownership stake. They agreed to have a meeting at a later date to discuss the terms of his exit.

That meeting occurred on April 4, 2014 in a restaurant. The parties were unable to reach any consensus on a fair buyout price for Omar's share of the partnership

---

[7] The acronym D.O.R.M. stands for the four partners' first names: Dean, Omar, Rima, and Mazen. The trial court found D.O.R.M. was formed with Omar's knowledge and there was no "ulterior motive or nefarious purpose in forming" it because it was intended to shield the partners from personal liability after they received the cease and desist letter.

[8] Omar had earlier formed a separate LLC for the partnership's business, but the LLC was never operational.

[9] Again, for our purposes, we need not review whether Omar printed the lists for legitimate purposes. Our resolution of the case is the same even if his action was wrongful and his termination was warranted.

5

because Omar insisted he was still a 25 percent partner and Rima, Mazen, and Dean insisted he was not. Omar told the three he would "see them in court" and abruptly left. Immediately upon his departure from the restaurant, Rima, Mazen, and Dean voted to dissolve the partnership.

*Winding Up the Partnership?*

Rima, Mazen, and Dean did not seek professional advice in approaching the dissolution or wind up of the partnership. Instead, Mazen took it upon himself to decide what was required, and Dean and Rima went along with it. They prepared no formal list of creditors or assets, and there was no formal accounting done to find out the true scope of the partnership's assets, liabilities, profits, and losses.[10] Instead, Mazen identified the partnership's creditors on his own and entered into agreements with them to settle the partnership's debts. The trial court stated there was no evidence as to the amount of said debts and how much it cost the partnership to settle them.

There was no plan to convert the partnership to a corporation. But in April 2014, Rima, Mazen, and Dean instructed PAN to deposit incoming funds into *DORM*'s bank account, over which Omar had no signatory authority.[11] This meant incoming payments from customer agreements were going into DORM's account as of that time, instead of the partnership's account. They transferred all of the partnership's assets – including client lists, office furniture, computer equipment, and CRM software – to DORM. Significantly, DORM paid nothing for these assets. Partnership employees were terminated and offered employment at DORM; new contracts with those who wished to accept the offer were executed. DORM also purchased some new equipment

---

[10]    The trial court concluded this was because "there were so few" creditors and assets and the creditors were well-known to the partners.

[11]    Leaving Omar off the list of signatories does not appear to have been nefarious, as he himself did not want to be associated with the account. Because of a prior dispute, he wished to maintain a low profile at the bank at which the account was opened. However, Omar's absence from the account was certainly beneficial for Dean, Rima, and Mazen.

6

and systems, contracted with a new data source for leads, and terminated the partnership's lease and leased new office space in DORM's name.

Then, in June 2014, Rima, Mazen, and Dean issued themselves shares in DORM, leaving out Omar. They named themselves corporate officers and directors and operated the same student loan consolidation business under the DORM entity's name. However, after a few months, they decided to divide the business into two parts – customer generation and customer servicing. They formed two new corporations, respondent Heritage Asset Management, Inc. (Heritage) and Tribune Management, Inc. (Tribune) for this purpose.

*The Lawsuit*

Omar was locked out with no compensation for his share of the partnership, and negotiations with his former partners had gone nowhere. So Omar filed a complaint against Rima, Mazen, Dean, and DORM on September 17, 2014, alleging 11 causes of action: breach of the partnership agreement, conversion of partnership assets, actual fraud, constructive fraud, conspiracy to convert the partnership assets, accounting, breach of fiduciary duty, breach of corporate opportunity doctrine, interference with economic relations, unfair competition, and declaratory relief. Heritage and Tribune were later added as defendants.

The case was originally scheduled for jury trial, but trial was bifurcated so that a stipulated list of equitable issues could be tried to the court first. These equitable issues included Omar's causes of action for accounting, declaratory relief, and unfair competition, three affirmative defenses, and equitable remedies including imposition of constructive trust and statutory remedies regarding wind-up and forced judicial sale of corporate entities. In addition to the stipulated equitable issues for the court to resolve, the parties submitted a helpful list of 52 stipulated facts.

A bench trial was conducted in late 2016 and early 2017 on the equitable issues, and a statement of decision was ultimately issued regarding them. The trial court

concluded Rima, Mazen, and Dean had expelled Omar and dissolved the partnership in good faith.  However, it concluded they did not have the legal right to unilaterally reduce his ownership stake, and at the time of the dissolution, he was entitled to 25 percent of whatever remained after wind-up.[12]  Furthermore, it found the three dissolving partners breached their fiduciary duties by transferring the partnership's assets to DORM for no consideration, but this transfer was still a liquidation and, coupled with Mazen's settlement of partnership debts, it effectuated the termination of the partnership.

On the basis of these conclusions, the trial court ordered an accounting as to five things: (1) the amount of cash owned by the partnership, regardless of whether the cash was held in the partnership's name or not, (2) the amount of payments received by the partnership from its existing customer accounts during the wind-up period, (3) the costs incurred and paid by the partnership in connection with servicing those accounts during the wind-up, (4) the amounts owed to the partnership's creditors and how much was paid to the creditors by Mazen, and (5) the amounts generated by any sale of partnership assets.  It also viewed it as "necessary" to determine how many customer accounts were active as of April 4, 2014, the amount of fees generated by them each month, the time period over which the fees would be payable, and the extent to which any of the accounts became inactive.

The parties stipulated to the appointment of referee M. Daniel Close to determine the fair market value of the partnership business as of April 4, 2014 and conduct an accounting regarding the five issues identified by the trial court.  His decision was to stand as the decision of the court regarding the amounts owed Omar, and the parties stipulated Close's opinion would resolve the remaining issues in the case.

---

[12]     Even though it found Omar had been dissociated for cause from the partnership in March 2014 under Corporations Code section 16601, the trial court correctly observed the dissolution had occurred within a 90-day period after the dissociation, thus reassociating Omar into the partnership for purposes of the wind-up. (Corp. Code, § 16701.5, subd. (b)(1).)

8

Close issued his statement of decision on September 6, 2018, finding the business was worth $236,000 as of April 4, 2014. The court entered judgment on January 7, 2019, awarding Omar all of $59,000, or 25 percent of the Close valuation.

## DISCUSSION

Omar's primary argument on appeal is that the trial court erroneously determined the dissolution and wind up of the partnership was valid. He argues the trial court drew from this incorrect antecedent the erroneous legal consequent that he was only entitled to 25 percent of the value of the partnership as of the dissolution. We agree.

### I. Dissolution and Wind-Up

We must first question whether the partnership was dissolved in good faith on April 4, 2014. The trial court found the vote to dissolve was valid under "Corporations Code [s]ection 16801(a), because at least half of the partners. . . expressed their will to dissolve the Partnership and wind up its business." We presume the trial court was referring to subdivision (1) of Corporations Code section 16801[13], which allows dissolution "[i]n a partnership at will, by the express will to dissolve *and wind up the partnership business* of at least half of the partners[.]" (Italics added.)

The trial court's analysis of the issue fails to take into account the second part of that sentence. While there may have been an express will to dissolve here, we can find no indication there was an express will to wind up the partnership *business*. Dean testified he, Mazen, and Rima voted to dissolve the partnership immediately after Omar abruptly left the April 2014 meeting, and the abrupt departure was due to Omar's refusal to accept his expulsion and the diminution of his 25 percent stake. This timing indicates the dissolution was not because Dean, Rima, and Mazen wished to *terminate* the partnership's business. On the contrary, they wanted to continue operating, just without Omar. They dissolved because they couldn't get him to agree to walk away.

---

[13] All statutory references are to the Corporations Code.

9

Such use of the dissolution mechanism was a breach of the respondents' fiduciary duty. "'Partnership is a fiduciary relationship, and partners are held to the standards and duties of a trustee in their dealings with each other. ""'[I]n all proceedings connected with the conduct of the partnership every partner is bound to act in the highest good faith to his copartner and may not obtain any advantage over him in the partnership affairs by the slightest misrepresentation, concealment, threat or adverse pressure of any kind." [Citations.]""' (*BT–I v. Equitable Life Assurance Society* (1999) 75 Cal.App.4th 1406, 1410–1411, quoting *Leff v. Gunter* (1983) 33 Cal.3d 508, 514 (*Leff*).) Or, to put the point more succinctly, 'Partnership is a fiduciary relationship, and partners may not take advantages for themselves at the expense of the partnership.' (*Jones v. Wells Fargo Bank* (2003) 112 Cal.App.4th 1527, 1540; see *Jones v. H.F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 108, 111.)" (*Enea*, *supra*, 132 Cal.App.4th at p. 1564.)

Such advantages include usurpation of partnership opportunities. ". . .[T]he continuing fiduciary duty which survives dissolution of the partnership is breached if the ex-partner attempts to divert partnership opportunities for his personal benefit to the detriment of his former partners (*Leff* [*supra,*] 33 Cal.3d [at p.] 514) or when the remaining partners exclude the ex-partner from the benefits of an existing partnership opportunity (*Rosenfeld, Meyer & Susman v. Cohen* (1983) 146 Cal.App.3d 200, 218, disapproved on other grounds in *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 521, fn. 10; *Page v. Page* (1961) 55 Cal.2d 192, 197–198)." (*Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1551.)

In *Leff,* the defendant partners withdrew from their joint venture with plaintiff Leff in order to make a clandestine bid on a federal building contract without him. Our Supreme Court found a partner's duty not to compete with the partnership on an opportunity being pursued "survives his withdrawal therefrom," stating: "It is no less a violation of the trust imposed between partners to permit the personal exploitation of that partnership information and opportunity to the prejudice of one's former associates by the

10

simple expedient of withdrawal from the partnership." (*Leff, supra,* 33 Cal.3d at p. 514.) Essentially, the *Leff* court found the defendants' withdrawal from the joint venture to be in bad faith because it was a mechanism being used to exclude Leff from a partnership opportunity.

We cannot see how Dean, Rima, and Mazen's dissolution of the partnership here is all that different from the withdrawal in *Leff*. The partnership was a going concern with an active business, albeit not as active as the partners would have liked at that point. Every new customer brought into the business was a partnership opportunity.[14] They dissolved in order to get rid of Omar and exclude him from participating in the business' increasing success. Indeed, Omar made this argument to the trial court, but the trial court rejected it, stating: "the Court finds that Rima, Mazen and Dean did not breach their fiduciary duties by dissolving the Partnership. Their decision to dissolve the Partnership and thereafter move forward with their business via the DORM corporate entity they had created earlier was in good faith and not for an improper purpose."[15] This is problematic.

Granted, all four of the partners on any number of occasions may have expressed the mutual desire to change the entity under which they were doing business. But that is different from an intention to wind up the business as a whole. If they simply wished to go on with the business without Omar (which the facts indicate they were justified in doing), their proper legal recourse was to seek to judicially dissociate Omar from the partnership pursuant to section 16601, subdivision (5) and follow the buyout procedure under section 16701. After doing so, they could proceed to convert to a

---

[14] Respondents' counsel argued at trial that the partnership opportunity doctrine was inapplicable because it only applies to new and distinct opportunities, such as a new contract. We reject such an argument. Because respondents intended to continue operating the business, each new customer represented an opportunity for the partnership to generate a new stream of future income.

[15] The trial court does not elaborate much on this conclusion, except to say it was not in bad faith for Dean, Mazen, and Rima to use the DORM entity because it had, until then, been "just an empty corporate entity." We presume the trial court simply meant that DORM was not created as a tool to exclude Omar. This may well be the case, but its subsequent use appears less benign.

11

corporation or undertake any other activity necessary to form a limited liability entity for the business. Instead, from what we can see, the respondents used dissolution to squeeze Omar out.

But let's leave that aside for the moment. Let's assume the dissolution was valid pursuant to section 16801. This fact nonetheless remains: the partnership's business was never wound up. "Winding up is 'the process of completing all of the partnership's uncompleted transactions, of reducing all assets to cash, and of distributing the proceeds, if any, to the partners.' (Gregory, The Law of Agency and Partnership (3d ed. 2001) § 227, p. 368.) Under [the Revised Uniform Partnership Act] RUPA, '[a] person winding up a partnership's business may preserve the partnership business or property as a going concern for a reasonable time, prosecute and defend actions and proceedings, whether civil, criminal, or administrative, settle and close the partnership's business, dispose of and transfer the partnership's property, discharge the partnership's liabilities, distribute the assets of the partnership pursuant to Section 16807, settle disputes by mediation or arbitration, and perform other necessary acts.' (Corp. Code, § 16803, subd. (c).)" (*Heller Ehrman LLP v. Davis Wright Tremaine LLP* (2018) 4 Cal.5th 467, 481.)

What was done here looks nothing like the activities outlined above.[16] The only thing Mazen did consonant with a wind-up was to settle the partnership debts with creditors. But even for that position, we have no formal record of the creditors and the amounts due or amounts paid. Respondents did not "complete" the partnership's uncompleted transactions. They transferred the partnership's uncompleted transactions to their new entity. And by their own account, they continued to initiate *new* business

---

[16] This is partly because, as Mazen admitted at trial, the dissolving partners never engaged an attorney to help them navigate the process. Instead, his only research into the process involved contacting an attorney cousin for advice. When pressed as to why he never sought a formal legal opinion on how to handle the dissolution, he answered unenlighteningly: "Because I did not."

12

during the purported "wind up" period – an act inconsistent with winding-up.[17] (See *King v. Stoddard* (1972) 28 Cal.App.3d 708, 712.) Respondents did not reduce the partnership's assets to cash.[18] They transferred the only assets of any material value – the customer agreements – to a corporation *they controlled* without paying the partnership a dime for them.

As Omar's expert, James Walters, testified, there was no final tax return or articles of dissolution filed by the partnership with the state, and there was no evidence the partnership's up-to-date taxes were paid.[19] In fact, there was no accounting at all for assets and liabilities. There were no charges and credits to the partners' accounts because Mazen did not formally account for the settlement of partnership debts. (See § 16807, subd. (b).) Was there a deficit once Mazen paid the creditors? Or a surplus? In the former situation, each partner would have to put up an amount to cover said deficit.[20] (*Ibid.*) In the latter, each partner would be owed a distribution of the proceeds. (*Ibid.*)

Yet it seems no partner either shelled out a penny or took one in. We can see no evidence of a distribution of any proceeds from the wind-up amongst Dean, Rima, or Mazen, let alone to Omar. Are we to assume respondents broke exactly even in the

---

[17] Dean prepared a spreadsheet of customer accounts created between August 2013 and September 2015. The spreadsheet does not distinguish between accounts generated by the partnership, DORM, Heritage, and Tribune. However, respondents have always maintained DORM did not become operational until June 2014. If this was indeed the case, the spreadsheet reflects that, between April 4, 2014 (the date of dissolution) and June 18, 2014 (the purported completion date of wind-up), the partnership signed an additional 1500 customers. Doesn't sound like winding-up to us.

[18] We cannot agree with the trial court's conclusion the assets were liquidated "after a fashion" because they were transferred to DORM for no consideration. The relevant definitions of the word "liquidate" are: "to determine the liabilities and apportion assets toward discharging the indebtedness of (as a firm that is going out of business)" or "to convert (assets) into cash." (Webster's 3d New Internat. Dict. (1981) p. 1319.) As to the former, there was no accounting. And the latter definition entails converting illiquid assets to cash or a cash equivalent, presumably through a sale on the open market. The respondents admit they never offered the customer accounts for sale. Mazen claimed sale of the customer accounts "was really not an option" because there was no accurate way to value them. But in an age replete with debt-based securities, we are confident he could have found an investment banker or broker willing to give it a try.

[19] According to Mr. Walters, this could leave the partnership and partners open to any remaining tax liability the partnership had incurred and not yet paid.

[20] In the proceedings below, respondents contended the customer agreements were a liability rather than an asset – a proposition the trial court found dubious. As do we.

13

wind-up?  And in the absence of any contemporaneous records, are we just to take respondents' word for it?

We cannot.  From our review of the record, the partnership was neither wound up nor converted.[21]  It was quite simply plundered and its business usurped in favor of the new respondent entities and their owners – their number now reduced to three.

The trial court stated it did "not accept the argument that a *flawed* wind up is the equivalent of *no* wind up."  That statement is not inaccurate – very little of what this judge does is inaccurate.  But we question its application to these facts.  We would not call this "a flawed wind up" or even "the equivalent of no wind up."  We simply do not believe the phrase "wind-up" has any place in the description of these facts.  Calling this a wind-up sanitizes what occurred.  From the record before us, it appears Mazen, Rima, and Dean orchestrated a misappropriation of the partnership's assets in order to achieve their desired result of expelling Omar.

Their decision to do so has a weighty legal consequence.  Because a wind-up was never effectuated, the partnership never legally terminated.  (See § 16802, subd. (a).)  Which means it remains in existence today.  It is entitled to compensation for the conversion of its assets and opportunities. [22]  And Omar is entitled to his share of the same.

---

[21]     Omar argues the partnership was never properly converted to a corporation, if indeed that is what respondents wished to do.  We find the issue moot.  Respondents freely admitted and agreed there was no conversion of the partnership under the Code.  Which makes what they did seem even more brazen, in our view.

[22]     The partnership was not just the sum of the four partners' interests.  It was itself a separate legal entity to which respondents (and Omar, for that matter) owed fiduciary duties.  (See §§ 16201, 16404.)

14

## II.     Remedy and Damages

Given our conclusions above, the $59,000 awarded Omar in the judgment is patently inadequate, especially for a business valued only a year or so after the fact at $4.1 million by respondents' own expert.  Moreover, the valuation done by the appointed referee, Mr. Close, incorporated some faulty legal assumptions.  Mr. Close did not make an explicit appraisal of the value of the customer accounts.  As the primary asset of the partnership, such an appraisal must be included in any valuation of it – or, for that matter, of any of the businesses involved here.  Mr. Close also incorrectly valued the partnership as of the date of dissolution – April 4, 2014.  Had the partnership been properly dissolved and wound up, Omar would have been due his 25 percent share of the proceeds on the date of the wind-up, not the date of the dissolution.  Since a partner in charge of wind-up can "preserve the partnership business or property as a going concern for a reasonable time" as necessary to finish the business of the partnership, the valuation should have included cash flows occurring during the wind-up period.  (See § 16803, subd. (c).)  Nor did Mr. Close does fully incorporate the finances of DORM, Heritage, and Tribune in his assessment.

Thus, our next question is: how *is* Omar to be made whole?  We conclude this issue must be remanded to the trial court for resolution, potentially by forensic accounting and/or jury trial as the trial court, in consultation with the parties, may deem appropriate.  But since the trial court is to take the laboring oar, we provide here some guidance in how the issue should be approached.

We begin with a stark truth.  While Rima, Mazen, and Dean dissolved the partnership in bad faith, and it has remained in existence for lack of a wind-up, its existence must unquestionably be terminated now.  Had any of the parties applied for judicial dissolution under section 16801, subdivision (5), there would be ample grounds to grant the request.  With what has transpired between the four partners, it is no longer

15

reasonably practicable for the partnership to continue.[23]  (§ 16801, subds. (5)(B) & (C).) So what must occur next is a wind-up pursuant to Article 8 of the RUPA, and Omar must receive his rightful share of these proceeds.

Winding-up requires an evaluation of the value of assets (mostly customer agreements, from what we can gather) and opportunities rightfully belonging to the partnership, existing as of the time the partnership was supposed to have been wound up. The amount of liabilities owed by the partnership at the time of dissolution and amounts paid by Mazen to settle them must be ascertained.  Once this accounting of assets and liabilities is completed, the partners' accounts must be settled according to section 16807.

Because the partnership assets and opportunities were converted by the respondents during the wind-up period, Omar is also entitled to his share of damages stemming from this conversion.  Where a fiduciary converts a corporate or partnership opportunity for its own benefit, the wronged entity is entitled to claim for itself the benefits obtained by the converting fiduciary.  (See *Industrial Indem. Co. v. Golden State Co.* (1953) 117 Cal.App.2d 519, 533.)   This means Omar is entitled to a share of the present value of the partnership's converted opportunities.  As such, an accounting of the partnership assets for purposes of wind-up must necessarily (1) trace the converted assets and opportunities, (2) ascertain who currently controls them, and (3) assess their present value.  To do this, the books and records of DORM, Tribune, and Heritage must be fully opened to examination.  Once a valuation of the partnership's misappropriated assets and opportunities is completed, said value may be included in the accounting of partnership assets and liabilities, and folded into the settlement of partner accounts.

There must also be an accounting for distributions taken by Rima, Mazen, and Dean from DORM, Tribune, or Heritage to the extent these distributions included monies derived from the partnership's converted assets and usurped opportunities.  (See §

---

23       We therefore disagree with Omar's contention that he is entitled to a 25 percent stake in DORM.

16

16404, subd. (b)(1).)  It may be most practical to incorporate these distributions into the settlement of partner accounts as well.

All four partners are entitled to have their accounts settled in accordance with their 25 percent stake.  We agree with the trial court's conclusion that Dean, Rima, and Mazen did not have authority to unilaterally reduce Omar's partnership stake based on his performance.  There is no evidence of any such term in the parties' oral agreement, and allowing such a reduction would effectuate an unfair forfeiture.  (See *O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044, 1057.)

In sum, the partnership must be wound up and Omar is entitled to damages according to his 25 percent stake, taking into account any monies already received by way of the judgment and any asserted affirmative defenses deemed applicable as an offset.   Adequate compensation for Omar can be achieved through a comprehensive settlement of partner accounts as described above.  Expert evidence will likely be valuable in arriving at an accurate number.

## DISPOSITION

The judgment is reversed and remanded to the trial court for proceedings to determine an appropriate amount of damages due to appellant consistent with the conclusions reached herein.  Appellant is to recover his costs on appeal.



BEDSWORTH, ACTING P. J.

WE CONCUR:



MOORE, J.



THOMPSON, J.

17