Filed 10/23/20  Kozub v. Arakelian CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| JAMES KOZUB, as Trustee, etc.,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>JOY ARAKELIAN et al., as Trustees, etc.,<br><br>Defendants and Respondents. | F079258<br><br>(Super. Ct. No. 15CECG02112)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Kimberly A. Gaab, Judge.

Georgeson Law Offices, C. Russell Georgeson and Robert J. Willis for Plaintiff and Appellant.

Whitney, Thompson & Jeffcoach, Timothy L. Thompson and Sharon Refuerzo for Defendants and Respondents.

-ooOoo-

In 1974, two friends entered into a written contract.  One of them had recently formed a partnership with a group of real estate investors and agreed to sell a fraction of his interest therein.  The buyer was promised a share of the partnership's profits.  The contract was executed and honored for the rest of the contracting parties' lives, and it

continued to be honored by and between their surviving spouses. However, once the next generation of heirs got involved, a dispute arose over the nature of the agreement.

Appellant James Kozub is the son of the original buyer. Respondents Joy Arakelian and Eddie Arakelian are the niece and nephew, respectively, of the original seller, whose partnership interest passed to his spouse, i.e., respondents' aunt, after he died. Prior to her own death, respondents' aunt sold her interest in the partnership to a trust. Respondents are the trustees and beneficiaries of that trust.

In a prior lawsuit, it was determined the original seller had assigned to the original buyer 5 percent of his 22.5 percent interest in the partnership's profits. The judgment, which was entered in 2013, deemed Kozub the current owner of what had been his father's "personal property interest as an assignee." Kozub was therefore entitled to continue receiving a share of the partnership's profits.

In 2014, respondents began alleging they had acquired Kozub's fractional interest by virtue of their aunt's sale of her own partnership interest to her trust. In reliance on this theory, respondents tendered a check in the amount of $357,887, claiming it represented Kozub's share of the proceeds from the sale. Kozub was told no additional payments would ever be made, as the sale had effectively extinguished his rights regarding the partnership's profit distributions.

Kozub rejected the check and initiated a civil action for declaratory relief. He argued the interest previously transferred to his father was independently owned by him. Therefore, respondents' aunt had no ability to unilaterally sell his personal property to a third party. Respondents argued Kozub's rights were derivative of, and contingent upon, their aunt's entitlement to a share of the partnership's profits. Consequently, once their aunt had divested herself of the right to receive such profits, Kozub's rights to any profits allegedly ceased to exist. The trial court accepted respondents' theory and entered a judgment in their favor.

2.

All issues in this appeal are ultimately resolved by judicial findings made in the earlier case. It was previously determined that the original seller's 22.5 percent interest in the partnership's profits was reduced to a lesser percentage when he sold a fractional interest to Kozub's father. Under the prior judgment and all applicable law, that fractional interest is exclusively owned by Kozub and was not included in the transaction between respondents' aunt and her trust. Respondents' aunt was not capable of selling more than what she owned. Therefore, the judgment from which this appeal is taken must be reversed.

## FACTUAL AND PROCEDURAL BACKGROUND

Consistent with the parties' briefing, all now-deceased individuals are identified once by their full name and then referred to by first name only. This is done to avoid confusion in references to different people from the same family. The abbreviation "RPP" refers to the original general partnership known as River Park Properties and, wherever applicable, includes its association with various successor entities.

### Historical Background

In August 1974, five real estate investors formed a general partnership, RPP. Four of the partners, including Joe Josephine (Joe), each initially owned a 22.5 percent interest in the partnership. The fifth partner owned a 10 percent interest. At the time of these events, Joe was married to Margaret Josephine (Margo).

In December 1974, Joe made an agreement with his friend and business associate, Walter Kozub (Walter). The agreement was memorialized in a letter written by Joe and signed by both parties. The letter incorrectly identified Joe's percentage interest in RPP as being 33.33 percent instead of 22.5 percent. There is no dispute over this discrepancy, and for our purposes it is immaterial. The body of the letter, with the correct percentage and privacy redactions bracketed, reads as follows:

"Dear Walt:

"As you know, I recently acquired from [two of the RPP partners], on an installment sale basis, a 1/3rd undivided interest in [certain real property]. They retained l/3rd interest and the other 1/3rd interest is owned by [RPP's original managing partner]. We have formed a partnership agreement for the holding and/or developing of the property.

"This is to confirm the fact that you have purchased from me a 5% interest of my [22.5% interest in the partnership]. You will not be shown as a record holder in the Recorder's office of Fresno County, but you are, in fact, the owner of such interest regardless of what the record shows. I am not giving you a deed for your interest at this time to avoid confusion with the other partners.

"This is also to acknowledge receipt of payment from you for your respective share of the obligations to date.

"I am assured by you that you will continue to pay your respective share of the obligations when said become due, whether property taxes, payment of principal or interest, or other expenses for the property. You understand that we will have to be governed by the partnership agreement and abide by its terms. If you maintain your interest, you will be entitled to share in the profits equal to 5% of my total share of [22.5%]. You should also understand that you will not have a formal voice in the management of the affairs of said real property partnership, but rest assured that I will discuss, as I am sure [a previously identified partner] will, the problems with you and keep you informed on the status of the property at all times and especially on request."

Although Joe's fellow partners were aware of his agreement with Walter, RPP regularly disbursed to Joe a 22.5 percent share of the partnership's profits. Joe, in turn, would deliver to Walter a sum equivalent to 5 percent of the payment he had received. This arrangement continued until 1987, when Joe died. Joe's surviving spouse, Margo, subsequently acquired Joe's partnership interest and replaced him as a partner of RPP.

Following Joe's death, Walter received a share of RPP's profits from Margo or her accountant, and occasionally from RPP directly. In July 1993, Walter established the Kozub Family Trust and transferred into it the interest he had acquired from Joe in 1974. Walter died a few months later, and his surviving spouse, Opal Kozub (Opal), became trustee of the trust. For many years thereafter, Margo or her accountant would deliver a

4.

share of the RPP profits to Opal or an accountant working for Opal and the Kozub Family Trust.

In 2002, a partnership dispute culminated in the dissociation of a founding partner and RPP's buyout of his partnership interest, which was reallocated to the remaining partners. As a result, Margo's interest in RPP increased by approximately 6.159 percent.[1] Opal was generally made aware of these developments. Margo and her representatives subsequently described the interest held by the Kozub Family Trust as being 3.925 percent of 28.659 percent instead of 5 percent of 22.5 percent. Those are merely two different ways of expressing the same numerical value, but it would later cause confusion on the part of Kozub.[2]

Opal died in 2007. According to the record, the Kozub Family Trust had been amended in 2000 "to provide that, upon Opal's death, the [t]rust would terminate and the corpus plus income would be distributed to Kozub if then living." However, other parts of the record indicate the Kozub Family Trust still exists. In any event, it is undisputed that Kozub was the trustee and beneficiary of his family trust during time periods relevant herein.

Opal's death generally coincided with Kozub's efforts to determine the exact nature of his and/or his trust's rights vis-à-vis the profit distributions of RPP. Meanwhile, respondent Eddie Arakelian had begun making decisions on Margo's behalf pursuant to a power of attorney designating him and his sister, respondent Joy Arakelian, as Margo's co-attorneys in fact. One such decision was to have Margo's accountant stop providing the Kozub Family Trust with financial information regarding RPP's profit distributions.

From approximately 1987 through 2004, Margo's accountant had furnished copies of her schedule K-1 filings with the Internal Revenue Service (IRS) to the accountant

---

[1]The exact amount by which Margo's partnership interest increased in the years following Joe's death is unclear to us from the record.

[2]E.g., $0.05 \times 0.225 = 0.01125$, and $0.03925 \times 0.28659 = 0.011248$. Both equations translate to 1.125 percent of the total amount of RPP's profit distributions.

who worked for Walter, Opal, and the Kozub Family Trust. Those documents verified the amount of income Margo had received from RPP, which allowed Walter and his successors to verify they were receiving the payments to which they were entitled. From approximately 2005 until Eddie Arakelian told him to stop, Margo's accountant had prepared and provided summary reports in lieu of the actual schedule K-1 forms.

On January 10, 2008, Kozub sued Margo for "Constructive Fraud," "Breach of Fiduciary Duty," and "Partnership Dissolution." (*Kozub v. Josephine* (Super. Ct. Fresno County, 2008, No. 08CECG00102) (*Kozub I*).) According to subsequent judicial findings, the lawsuit was precipitated by Kozub's unsuccessful attempts to obtain "information from a number of persons, including [Eddie] Arakelian, about RPP and about the nature and extent of any [Kozub Family] Trust interest in Margo's interest in the RPP partnership."

### *Kozub I*

The *Kozub I* litigants stipulated to the appointment of a referee pursuant to Code of Civil Procedure section 638. A retired appellate court justice, Nickolas J. Dibiaso (the referee), was empowered to "hear and rule upon any issue which would otherwise have been presented to the [superior court]." The referee presided over a trial conducted in two phases (Phase I and Phase II) and issued a written statement of decision at the conclusion of each phase.

Kozub's claims were based on a theory that Walter and Joe had formed a separate partnership in relation to the profit distributions of RPP. The theory was completely misguided, but it shaped Kozub's legal arguments and dictated the scope of Phase I. For example, the pleadings reflect Kozub's misunderstanding as to why Margo began expressing his family's profit share as 3.925 percent of 28.659 percent instead of 5 percent of 22.5 percent. As previously explained (see fn. 2, *ante*) and generally noted in the Phase I statement of decision, both equations translate to 1.125 percent of the total amount of RPP's profit distributions to all of its partners. Pursuant to the erroneous

separate partnership theory, Kozub alleged Margo had "falsely … attempted to change and reduce [the Kozub Family Trust's] 5% interest in the [separate] Partnership to 3.925%."

Stated another way, Kozub alleged Margo and the Kozub Family Trust respectively held 95 percent and 5 percent interests in their own partnership as the successors of Joe and Walter. Kozub argued he was entitled to 5 percent of all RPP profits received by Margo regardless of whether her percentage interest in RPP had increased over time. Kozub's third cause of action sought to compel dissolution of the supposed partnership, which he estimated to be worth $50 million, and to have the assets "divided between Kozub and [Margo], 95% [Margo] and 5% Kozub." (Some capitalization omitted.)

Framed in light of the pleadings, the issue to be decided in Phase I was described by the referee in these terms: "'What is the interest, if any, of James Kozub, as Trustee, in [Margo]'s partnership interest in the River Park Properties Partnership?'" The Phase I trial included testimony by Margo's accountant, Kozub's accountant, the original managing partner of RPP, and the attorney who had represented Margo in her capacity as executrix of Joe's will in the probate proceedings following his death. Kozub and Eddie Arakelian also testified.

In September 2010, the referee issued a 30-page statement of decision (the Phase I decision). Kozub's separate partnership theory was rejected. Interpreting the 1974 letter agreement, the referee found Joe had "transferred [a portion of] his personal property interest in the RPP partnership to Walter individually." "As a consequence, Walter and Opal had, and Kozub as Trustee now has, the rights of an assignee ('transferee') of 5% of Margo's 'profits,' as that word is meant in the Letter, attributable to a 22.5% interest

7.

owned by her in RPP, subject to all the other terms and conditions of the Letter."[3] (Fn. omitted.)

The Phase I decision contains a lengthy discussion about the probate proceedings following Joe's death. A stand-alone paragraph reads: "As Joe's surviving spouse and sole heir, Margo received the distribution of the entirety of Joe's estate, including the 21.375% partnership interest in the RPP partnership and its property." The quoted sentence appears in the statement of facts, which is noted to constitute the referee's "findings of material fact, based upon the testimony of the witnesses given, the exhibits and other tangible evidence admitted …." The finding as to the reduction of Joe's partnership interest from 22.5 percent to 21.375 percent is repeated in other sections of the Phase I decision.[4]

Phase II consisted of evidentiary hearings in January 2012 and May 2013. After the first hearing, the referee issued this order: "[Margo] will pay to Kozub by check(s), within 30 days of the end of each calendar quarter, Kozub's share of [Margo's] profits received by [Margo] from [RPP] Partnership during the prior quarter. [Margo] will also provide with the check a sufficient document or other information that will enable Kozub to verify the accuracy of the check(s)." The order further required Margo to provide verified information regarding RPP's profit distributions from 2009 through 2012, i.e., during the pendency of *Kozub I*.

Margo died in February 2012. Fifteen months later, Phase II resumed with a hearing on matters including what "future" procedures were required "to enable Kozub to

---

[3]This sentence contains ambiguities, particularly with regard to the word "owned." Read in isolation, "owned" could be interpreted in either the past or present tense. Pursuant to our Discussion, *post*, the totality of the circumstances leads us to conclude the word is used in the past tense and thus refers to the 22.5 percent interest owned in 1974 before Joe sold a fraction of that interest to Walter. The word "attributable" means Kozub's interest traces back to the original 22.5 percent interest.

[4]Joe sold 5 percent of his 22.5 percent interest to Walter. Five percent of 22.5 percent is 1.125 percent (22.5% − 1.125% = 21.375%). As noted elsewhere in the Phase I decision, an alternative equation is $0.225 \times 0.95 = 0.21375$.

8.

identify and verify the payment of any and all 'profits' to [Margo]." As discussed above, prior to Eddie Arakelian's intervention, Margo's representatives had furnished documentation to Walter and his successors verifying the amount of RPP's profit distributions. The referee's rulings meant the old procedures would be reinstated in some fashion.

The other issue decided in May 2013 was the meaning of "profits" as used in the 1974 letter agreement and throughout the Phase I decision. Respondents' arguments in this appeal place great emphasis on the referee's definition, so it is important to explain the context in which the issue arose. The RPP partnership's buyout of a founding partner in 2002 was funded by contributions from the other partners, including Margo. For tax purposes, the transaction was structured as an indirect loan and the contributing partners were repaid over time by a third party rather than by the partnership itself. This led to a dispute over whether the loan repayments constituted "profits" in which Kozub held a legal interest. The record indicates there was also a disagreement over whether "profits" meant cash flow or earnings.

In September 2013, the referee issued his final statement of decision, into which the earlier Phase I decision was incorporated by reference. At some point prior to the end of Phase II, the defense had objected to the entry of a judgment in favor of Kozub due to his failure to plead "a 'cause of action for an "assignment" or other claim for declaratory relief that would warrant a judgment adjudicating the parties' respective present and/or future rights and responsibilities relative to' the assignment found by the Referee." In overruling the objection, the referee stated that "[t]he corollary issues arising as a consequence of the Referee's finding … [of] an assignment have been fully tried by the parties and heard by the Referee, the evidence relevant to those corollary issues is before the Referee, and the parties have submitted the corollary issues to the Referee for decision on that evidence."

On October 9, 2013, the superior court entered a final judgment in *Kozub I*. The judgment provides, in relevant part:

"1. Kozub, as Trustee of the Kozub Family Trust, and his/its successors and assigns, owns a personal property interest as an assignee of five percent (5%) of the profits attributable to Josephine's original twenty two and a half percent (22.5%) partnership interest in the River Park Properties Partnership and its successor limited partnerships.

"2. Kozub's rights as such assignee are subject to all terms and conditions of the December 27, 1974, letter agreement, a copy of which is attached hereto as Exhibit 1 and incorporated into this Judgment.

"3. The word 'profits' for purposes of the implementation of this Judgment is defined as follows:

"'Any and all receipts of cash or loan repayments under the provisions of the partnership agreement(s) by Josephine as a partner in any of the River Park limited partnership(s), successors of River Park Properties Partnership, from operations and capital events, including but not limited to refinancing transactions and sales. Except for loans and contributions to the River Park limited partnership(s) made in which the partner increases the partner's ownership percentage by acquisition of any partner's interest, Josephine payments to the River Park limited partnership(s) in the form of loans or capital calls consistent with the partnership agreement(s) shall reduce the amount considered as distributed.'

"4. Josephine will pay to Kozub, by checks(s) [*sic*], within thirty (30) days of the end of each calendar quarter of every year, an amount equal to five percent (5%) of the 'profits,' as defined above, attributable and proportionate to Josephine's original twenty-two and a half percent (22.5%) interest in the River Park Properties Partnership.

"5. Josephine, or her agent or representative, shall also, within thirty (30) days following receipt by Josephine of a K-l from a River Park limited partnership, cause to be submitted to Kozub a certified report which includes the following information:

"a. A summary of all distributions to Josephine shown on the K-l.

"b. A complete reconciliation of the amount of distributions shown on the K-l, segregated into the following components: (i) cash distributions and loan repayments to Josephine which Josephine acknowledges fall within the above definition of 'profits,' (ii) cash distributions and loan

10.

repayments to Josephine which Josephine claims do not fall within the above definition of 'profits,' and (iii) non-cash distributions.

"c. A copy of all notes for funds loaned to any one or more of the River Park limited partnerships and an amortization schedule for each such note.

"d. A copy of any and all capital calls received by Josephine from one or more of the River Park limited partnerships during the time period covered by the certified report.

"e. Such additional documents and information necessary, if any, to enable Kozub to verify each amount paid to Kozub as 'profits' and to verify the statements and claims made by Josephine in the 'complete reconciliation' described in 5.b. above.

"6. Josephine is liable to, and shall pay, Kozub the sum of $30,745.00, representing Kozub's share of the 'profits,' as defined above, owed to Kozub through the end of March 2013."

## The Present Case

The Margo Josephine Irrevocable Trust came into existence on July 30, 2008, approximately six months into the *Kozub I* litigation. It was designed to be an intentionally defective grantor trust. In simplified terms, the trust was created as part of a strategy devised by a team of Margo's attorneys, accountants, and other agents (i.e., respondents) to minimize the payment of estate taxes upon her death. More specifically, the trust was created to purchase and hold Margo's partnership interest in RPP.[5]

Respondents are the trustees and beneficiaries of the Margo Josephine Irrevocable Trust. In September 2008, the trust purchased the entirety of Margo's transferrable interest in RPP. (See Corp. Code, § 16502 [defining a partner's transferrable interest].) In 2009, the filing of a required gift tax return triggered an IRS audit of the transaction that lasted several years and concluded in 2014.

In October 2013, the Margo Josephine Irrevocable Trust paid Kozub the $30,745 owed under the *Kozub I* judgment. The check, which was signed by respondent Joy

---

[5]The information in this paragraph is taken from the testimony of Robyn Esraelian, an estate planning attorney who represented Margo and was involved in creating the trust.

11.

Arakelian in her capacity as trustee, included an additional $2,858 representing Kozub's share of RPP's most recent quarterly profit distributions. This payment was delivered by respondents' attorney along with a financial summary prepared by RPP's accountants that was tailored to the reporting requirements of the *Kozub I* judgment. For the next 11 months, RPP accountants prepared and provided the same type of reports to respondents. Respondents then forwarded the reports to Kozub along with his share of the RPP profit distributions.

In November 2014, respondents' accountant sent Kozub a letter informing him Margo had sold her interest in RPP to the Margo Josephine Irrevocable Trust "[p]rior to her death on February 10, 2012," for a sum of $9,117,056. The letter mentioned the IRS audit and noted the enclosure of a check in the amount of $357,887, which allegedly represented Kozub's "interest in [the] sales proceeds." As this figure represented 3.925 percent of the sale price, it necessarily implied Margo had sold a 28.659 percent interest in RPP. Additional enclosures confirmed respondents were claiming Margo had owned a 22.5 percent interest that increased by 6.159 percent as a result of the 2002 buyout of the disassociated partner.

Kozub's lawyer characterized the letter as an unsolicited offer to purchase Kozub's interest and rejected it on his client's behalf. Additional letters were exchanged between the parties' attorneys, with respondents' counsel asserting that the transaction and its supposed legal effect on Kozub's rights were beyond Kozub's control. The dispute led to Kozub's filing of the current lawsuit.

The operative first amended complaint, filed September 9, 2015, sought a declaration of the parties' rights and obligations under the *Kozub I* judgment. Kozub specifically requested a declaration that the sale of Margo's interest in RPP to the Margo Josephine Irrevocable Trust did not include any personal property interest owned by him. Additionally, Kozub sought a declaration that respondents are subject to the obligations listed in paragraph 5 of the *Kozub I* judgment (see, *ante*).

Kozub filed a motion for summary judgment, which was denied. The case then proceeded to a bench trial. The proceedings consisted of extensive briefing focused on the parties' respective interpretations of the *Kozub I* judgment. The trial court also heard testimony from Kozub, Eddie Arakelian, and the estate planning attorney who had helped create the Margo Josephine Irrevocable Trust.

Kozub's basic argument was that his personal property rights were established in *Kozub I*, and Margo had no ability to unilaterally sell his personal property. Respondents argued Kozub's rights were dependent upon Margo's rights, meaning Kozub was not entitled to any share of RPP's profits unless Margo was receiving profits. Kozub claimed defendants were barred from asserting their position under principles of res judicata, collateral estoppel, and waiver. Those theories were based on the fact Margo had sold her partnership interest in 2008, i.e., years prior to entry of the *Kozub I* judgment, yet neither Margo nor her successors had argued to the referee that Kozub's rights were affected by the transaction.

On February 15, 2019, the trial court issued a tentative statement of decision in favor of respondents. In doing so, the trial court adopted verbatim large portions of respondents' proposed statement of decision. Interpreting the *Kozub I* judgment the same way as respondents, the trial court ruled "[Kozub's] right to receive profits derived from Margo's interest in RPP and … was contingent on Margo actually receiving [profits as the term is defined in *Kozub I*]. Thus, if Margo did not receive any [profits] from RPP … [then] [Kozub] was not entitled to any monies." The trial court also found that "[a]fter Margo sold the entirety of her partnership interests in RPP … to the Josephine Trust, [Kozub's] right to receive profits was effectively extinguished."

On April 4, 2019, the trial court's tentative ruling became its final statement of decision and was incorporated by reference into the judgment, which was entered on the same date. Kozub's notice of appeal was filed on May 3, 2019.

## DISCUSSION

### I.  Availability of Declaratory Relief

"A declaratory judgment action provides litigants with a quick, efficient means of resolving a disputed issue.…  [A] party may ask the court for a declaration of rights or duties and the court may make a binding declaration of these rights." (*Mycogen Corp. v. Monsanto Co*. (2002) 28 Cal.4th 888, 897.)  Code of Civil Procedure section 1060 provides, in relevant part:  "Any person interested under a … contract … may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action … in the superior court for a declaration of his or her rights and duties …, including a determination of any question of construction or validity arising under the … contract."

The contract between Joe and Walter was interpreted in *Kozub I.*  This case involves a dispute over the parties' rights and obligations under the *Kozub I* judgment.  "[A] judgment is a contract upon which the parties may maintain a separate action between themselves." (*Miller v. Murphy* (1921) 186 Cal. 344, 347; accord, *Taylor v. George* (1949) 34 Cal.2d 552, 557.)  "Therefore, under the circumstances here 'where a declaratory judgment is sought not to challenge the validity or to seek a modification of a prior judgment, but merely to interpret the judgment and determine its effect on the rights and duties of the parties, … such relief is proper.'" (*Sandler v. Casale* (1981) 125 Cal.App.3d 707, 713.)

### II.  Standard of Review

A trial court's decision to grant or deny declaratory relief is typically reviewed for abuse of discretion.  (*Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515, 529.)  However, if the facts are undisputed and the ruling is based on legal determinations, the standard of review is de novo.  (*Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965, 974; see *Trustors Security Service v. Title Recon Tracking Service* (1996) 49 Cal.App.4th 592, 599 [de novo review applied in declaratory relief action involving statutory

14.

interpretation]; *Mendly v. County of Los Angeles* (1994) 23 Cal.App.4th 1193, 1205 ["'The interpretation of the effect of a judgment is a question of law within the ambit of the appellate court'"].) The trial court's denial of declaratory relief was based on its interpretation of the *Kozub I* judgment, which presents an issue of law. The parties cite *Dolan-King* in their briefing and appear to agree the standard of review is de novo.

"[T]he 'same rules apply in ascertaining the meaning of a court order or judgment as in ascertaining the meaning of any other writing.'" (*Estate of Careaga* (1964) 61 Cal.2d 471, 475.) If the language of the judgment is uncertain, judicial intent is determined by the totality of the circumstances. (*In re Ins. Installment Fee Cases* (2012) 211 Cal.App.4th 1395, 1429–1430.) "Thus, we construe the judgment as a whole to give effect to its obvious intention [citation], and in the process we can resort to the entire record supporting the judgment [citation]." (*In re Marriage of Farner* (1989) 216 Cal.App.3d 1370, 1376; accord, *Ticor Title Ins. Co. v. Rancho Santa Fe Assn.* (1986) 177 Cal.App.3d 726, 730 ["A court must view the language in light of the instrument as a whole and not use a 'disjointed, single-paragraph, strict construction approach'"].) Any ambiguity in the *Kozub I* judgment should be construed to make the judgment "'lawful, operative, definite, reasonable and capable of being carried into effect,'" and we must avoid an interpretation that would make it "'extraordinary, harsh, unjust, inequitable or which would result in absurdity.'" (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 989.)

## III. Law and Analysis

"California partnership law was codified in 1929 when the Legislature adopted the Uniform Partnership Act (UPA; Corp. Code, former § 15001 et seq.)." (*Heller Ehrman LLP v. Davis Wright Tremaine LLP* (2018) 4 Cal.5th 467, 474.) (Subsequent undesignated statutory references are to the Corporations Code.) As of January 1999, all general partnerships are governed by the Uniform Partnership Act of 1994 (§ 16100 et seq.), also known as the Revised Uniform Partnership Act (RUPA). (§§ 16100, 16111,

15.

subd. (b); see, e.g., *Heller Ehrman LLP*, *supra*, at pp. 472, 475.)  Unless otherwise provided in the UPA or RUPA, principles of law and equity supplement the applicable statutes.  (§ 16104, subd. (a); former §§ 15004–15005; *Ellis v. Mihelis* (1963) 60 Cal.2d 206, 217.)

A partnership is the association of two or more people to operate a business for profit as co-owners.  (§ 16101, subd. (a)(9); former § 15006, subd. (1).)  The partnership "is an entity distinct from its partners."  (§ 16201.)  Partners ordinarily share in the profits and losses of the partnership (*Chambers v. Kay* (2002) 29 Cal.4th 142, 151), and the division of such profits and losses "may be left to agreement of the partners" (*Feiger v. Winchell* (1962) 205 Cal.App.2d 123, 129).

The RUPA does not apply to rights that accrued prior to 1997.  (§ 16112; *In re Marriage of Lafkas* (2015) 237 Cal.App.4th 921, 933.)  Accordingly, the *Kozub I* judgment reflects an analysis under the UPA of the contract between Joe and Walter and other events that occurred from 1974 through 1997.  Joe, as one of the RPP partners, initially held "(1) his rights in specific partnership property, (2) his interest in the partnership, and (3) his right to participate in the management."  (Former § 15024; accord, *Tinseltown Video, Inc. v. Transportation Ins. Co.* (1998) 61 Cal.App.4th 184, 197.)[6]

A partner's "interest in the partnership" was statutorily defined as "his share of the profits and surplus" and classified as personal property.  (Former § 15026.)  The RUPA uses the term "transferrable interest," but the law is substantially the same:  "The only transferable interest of a partner in the partnership is the partner's share of the profits and

---

[6]Under the UPA, a partner was considered a "coowner with the other partners of specific partnership property [e.g., real estate,] holding as a tenant in partnership."  (Former § 15025, subd. (1).)  Under the RUPA, "[a] partner is not a coowner of partnership property."  (§ 16501.)  Both versions of the law declare individual partners have no transferrable interest in partnership property.  (*Ibid.*; former §§ 15025, subd. (2)(b), 15026.)

16.

losses of the partnership and the partner's right to receive distributions. The interest is personal property." (§ 16502.)

Under former section 15027, the assignment of a partner's "interest in the partnership" "merely entitles the assignee to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled." (*Id*., subd. (1).) Thus, as the referee explained in *Kozub I*, "a partner's transfer of the partner's interest in the partnership deliver[ed] only the partner's personal property interest in the partnership and d[id] not deliver any interest in any partnership property or any right to become or act as a partner." (See former §§ 15025, subd. (2)(b) [partner's individual rights in partnership property are not assignable], 15027, subd. (1) [assignment of an "interest in the partnership" does not entitle the assignee "to interfere in the management or administration of the partnership business or affairs"].)

The effect of a partner's transfer of his or her interest in partnership profits is the same under the RUPA. "A transfer, in whole or in part, of a partner's transferrable interest in the partnership is permissible." (§ 16503, subd. (a).) However, the transferee is not entitled to "participate in the management or conduct of the partnership business" (*id*., subd. (a)(2)), and "the transferor retains the rights and duties of a partner other than the interest in distributions transferred" (*id*., subd. (d)).

In *Kozub I*, it was determined that "Joe sold and Walter bought 5% of Joe's 22.5% personal property interest in RPP." This transaction was characterized as an assignment and a transfer. The terminology was used interchangeably, and for our purposes these words mean the same thing. As used in the RUPA, a transfer "includes an assignment." (§ 16101, subd. (a)(18).)

A transfer is defined as "an act of the parties, or of the law, by which the title to property is conveyed from one living person to another." (Civ. Code, § 1039.) "Under California law, to '"assign" ordinarily means to transfer title or ownership of property.'" (*Otay Land Co.*, *LLC v. U.E. Limited*, *L.P.* (2017) 15 Cal.App.5th 806, 860 (*Otay Land*

17.

*Co.*); accord, *Commercial Discount Co. v. Cowen* (1941) 18 Cal.2d 610, 614; *Arabia v. BAC Home Loans Servicing, L.P.* (2012) 208 Cal.App.4th 462, 472.) An assignment carries with it all rights of the assignor in the thing assigned. (*Johnson v. County of Fresno* (2003) 111 Cal.App.4th 1087, 1096; *Foreman Roofing Inc. v. United Union of Roofers etc. Workers* (1983) 144 Cal.App.3d 99, 107 (*Foreman Roofing, Inc.*); see Civ. Code, § 1084 ["The transfer of a thing transfers also all its incidents, unless expressly excepted"].)

When Walter purchased a fraction of Joe's 22.5 percent personal property interest in RPP, he acquired ownership of the assigned interest. (See *Otay Land Co.*, *supra*, 15 Cal.App.5th at p. 860; *Office of Statewide Health Planning & Development v. Musick, Peeler & Garrett* (1999) 76 Cal.App.4th 830, 834 [an assignment effectuates """"an immediate change of ownership""""].) As explained, "the interest acquired by the purchaser of a partnership interest is limited by operation of law to the partner's share of profits and surpluses, with no acquisition of interest in partnership property or management participation." (*Hellman v. Anderson* (1991) 233 Cal.App.3d 840, 852.) Therefore, Joe retained all of his rights in the partnership property and ability to participate in the business, but his "interest in the partnership," i.e., "his share of the profits and surplus" (former § 15026), was reduced from 22.5 percent to 21.375 percent. (See fn. 4, *ante*.)

RPP routinely distributed 22.5 percent of the partnership profits to Joe, which exceeded Joe's legal interest in the partnership. Joe, in turn, delivered to Walter his (Walter's) share of the same. Walter's ownership of 5 percent of Joe's original 22.5 percent interest in the partnership was the mathematical equivalent of a 1.125 percent interest in the total amount of RPP profits distributed by the partnership to its partners. (See fn. 2, *ante*; former §§ 15026, 15027.) In *Kozub I*, the assignment was found to have remained valid beyond the deaths of Joe and Walter (an unremarkable finding given the applicable law), with the assigned interest passing to Walter's wife and later to his son,

18.

Kozub.  Joe's successors followed the same course of conduct in dealing with Walter's successors whenever RPP distributed profits to them in excess of their "transferrable interest" (§ 16502) in the partnership.  For ease of reference, we henceforth refer to the interest assigned by Joe to Walter as "Kozub's economic interest in RPP."

Under the UPA, the death of a partner resulted in dissolution of the partnership "unless otherwise provided in an agreement in writing signed by all the partners before such death."  (Former § 15031, subd. (4).)  The RPP partnership agreement specified the death of a partner would not result in dissolution and permitted "the decedent's personal representative" and/or "any distributee of all or part of the decedent's partnership interest … [to] become a partner in the partnership."  Following Joe's death in 1987, Margo acquired Joe's partnership rights and became a partner of RPP.[7]

The referee made a specific finding:  "As Joe's surviving spouse and sole heir, Margo received the distribution of the entirety of Joe's estate, including the 21.375% partnership interest in the RPP partnership."  This finding was reiterated multiple times, e.g., "only Joe's *actual* 21.375% of RPP was included, valued, and distributed to Margo in Joe's probate proceeding."  (Italics added.)  Here is another example:  "Walter's 5% interest in Joe's interest in RPP was not included, properly, as an asset of Joe's estate.… In practical effect, Walter's *ownership* as an assignee of 5% of Joe's 22.5% interest in RPP was acknowledged and confirmed—at least as between Walter and Margo—in Joe's probate proceeding."  (Italics added.)  The referee's findings were adopted by the superior court in *Kozub I* and thus incorporated into the *Kozub I* judgment.

---

[7]In *Kozub I*, Joe's rights in the partnership property were found to have "vested in the surviving partners" by operation of law, but Margo was impliedly found to have acquired Joe's "right to participate in the management" within the meaning of former sections 15018, subdivision (e), and 15024.  Although Joe had "ceded the business management of RPP to [the managing partner]" as per the RPP partnership agreement,  "an agreement relinquishing control is itself an exercise of the requisite right of control over the conduct of the partnership business." (*Moulin v. Der Zakarian* (1961) 191 Cal.App.2d 184, 190.)  The referee noted Margo "participated in the affairs of RPP as an individual partner under the authorization in the RPP partnership agreement."

It is axiomatic that one cannot sell what one does not own, at least not without the owner's consent or other legal authorization. In terms of Joe's original 22.5 percent interest in the profits of RPP, Margo's "transferable interest" (§ 16502) was only 21.375 percent, which was the most she could have transferred to the Margo Josephine Irrevocable Trust. (Cf. *Kenworthy v. Hadden* (1978) 87 Cal.App.3d 696, 700–701 [wife holding a community property interest in husband's partnership interest "could not devise an interest greater than her own"].) The remaining 1.125 percent interest was owned by Kozub, and Margo was incapable of unilaterally selling Kozub's interest to a third party.

"[O]nce a valid assignment has been made, the assignor cannot cancel or modify the completed assignment by unilateral action without the assent of the assignee, nor may he defeat or impair the rights of the assignee in any other way [citations]." (*In re Marriage of Shore* (1977) 71 Cal.App.3d 290, 296; accord, 7 Cal.Jur.3d (2019) Assignments, § 54, pp. 80–81.) Respondents are therefore incorrect when they argue Margo's sale of her transferrable interest "extinguished" Kozub's rights. An assignment extinguishes the rights of the *assignor* in the thing assigned. (*Gietzen v. Covenant RE Management, Inc.* (2019) 40 Cal.App.5th 331, 339; *McCown v. Spencer* (1970) 8 Cal.App.3d 216, 225.) Joe, as assignor of 5 percent of the original 22.5 percent interest in the partnership, relinquished all rights in the interest assigned to Walter, hence the *Kozub I* finding that Margo inherited only a 21.375 percent interest in the profits of RPP.

In the transaction between Margo and the Margo Josephine Irrevocable Trust, Margo was the assignor and her trust was the assignee. (See *Foreman Roofing Inc.*, *supra*, 144 Cal.App.3d at p. 107 ["The transfer of title to any party or entity is an assignment of rights"].) "The assignee's rights 'are no greater than those of the assignor.'" (*Casiopea Bovet, LLC v. Chiang* (2017) 12 Cal.App.5th 656, 663; accord, *San Diego Construction Co. v. Mannix* (1917) 175 Cal. 548, 558 [assignee "can claim no greater rights against the plaintiff, under the contract, than were available to her assignor"]; *Benson v. Andrews* (1955) 138 Cal.App.2d 123, 132.) Therefore, the Margo

Josephine Irrevocable Trust did not acquire Kozub's economic interest in RPP when it purchased the entirety of Margo's transferrable interest in the partnership.

Contrary to respondents' arguments, granting Kozub declaratory relief pursuant to the above analysis does not "rewrite or modify" the *Kozub I* judgment. Kozub was found to possess the rights of an assignee, and the legal effect of an assignment is black letter law. A finding was made regarding Margo's transferrable interest in RPP following Joe's death: it was 21.375 percent, not 22.5 percent. Margo's transferrable interest later increased, reportedly by 6.159 percent, as a result of RPP's buyout of a partner who disassociated from the partnership. Margo and her representatives subsequently described Kozub's economic interest in RPP as being 3.925 percent of 28.659 percent, which is another way of saying 5 percent of 22.5 percent. Both equations translate to a 1.125 percent interest in the total amount of profits distributed by RPP to its partners. (See fn. 2, *ante*.) The *Kozub I* judgment makes clear Margo's transferrable interest in RPP when she executed the sale agreement with her trust was 21.375 percent plus whatever additional interest she had acquired from RPP's buyout of the disassociated partner. It necessarily follows that her transferrable interest did not include Kozub's economic interest in RPP, i.e., the previously assigned 5 percent of the original 22.5 percent.

Respondents contend Kozub's economic interest in RPP "was merely attributable to, and derivative of, Margo's entitlement to profits." Therefore, as the argument goes, Kozub's entitlement to a share of RPP profits was contingent upon Margo's receipt of profits from the partnership. Once Margo stopped receiving profit distributions, Kozub allegedly lost his right to receive 1.125 percent of the RPP profits. The subtext of this argument is Margo's sale of her transferrable interest in RPP allowed her to unilaterally sell Kozub's economic interest in RPP to the buyer as part of the transaction.

Respondents' argument is based on isolated words and phrases in the *Kozub I* judgment. They also vaguely purport to rely on section 16503, i.e., the statute governing

21.

transfers of a partner's interest in partnership profits. Respondents' position is untenable for multiple reasons. The fundamental flaw is their assumption Joe and Margo retained a 22.5 percent interest in the profits of RPP despite having sold part of the interest to Walter in 1974.

Section 16503 provides, in relevant part: "A transferee of a partner's transferrable interest in the partnership has a right to …: [¶] … receive, in accordance with the transfer, distributions to which the transferor would otherwise be entitled." (*Id*., subd. (b)(1).) This is a partial restatement of former section 15027, subdivision (1), and both provisions use the phrase "would otherwise be entitled." Respondents suggest this language means a transferee's right to receive profit distributions is contingent upon the transferor retaining some portion of his or her "transferrable interest" (§ 16502) in the partnership. In their words, "If Margo did not receive any [profits] from RPP, [Kozub] was not entitled to such payments."

Pursuant to respondents' reasoning, a partner could sell 99 percent of his or her transferrable interest in a partnership to buyer #1, retain a 1 percent interest for some appreciable period of time, and then terminate buyer #1's entitlement to a share of the profit distributions by selling the remaining 1 percent interest to buyer #2. Moreover, buyer #2 would then somehow own 100 percent of the partner's transferrable interest. However, by further extension of respondents' reasoning, buyer #2 would immediately lose the ability to receive any of the partnership's profit distributions because such rights are wholly dependent upon the transferor's entitlement to such distributions. Interpreting the statute in this manner would open the door to all kinds of paradoxical scenarios, double dealing, and outright fraud.

Applying respondents' theory to our facts, Walter's right to receive a share of RPP profits based on his assigned interest would have ended when Joe, the assignor, died in 1987. However, despite the cessation of the assignor partner's receipt of profit distributions, the referee found Walter and his successors remained entitled to receive a

22.

share of the RPP profits as owners of the assigned interest. Respondents also fail to account for Margo's death in 2012. If Kozub's rights were contingent upon Margo's receipt of profits, respondents would have stopped paying Kozub after she died. Instead, respondents continued making payments to Kozub as required by the *Kozub I* judgment during the 32-month interval between Margo's death and when the sale agreement with her trust had been "finalized." Another unexplained aspect of respondents' theory is how the trust, as transferee of Margo's entire transferable interest, can now receive profit distributions if a transferee's rights are "derivative of" and "contingent upon" the transferor's receipt of such distributions.

We do not view the language of section 16503, subdivision (b)(1) as ambiguous. However, even when a statute is susceptible of more than one *reasonable* interpretation, reviewing courts read ambiguous language in context, in light of the statutory scheme, and "avoid an interpretation that would lead to absurd consequences." (*Wells Fargo Bank, N.A. v. 6354 Figarden General Partnership* (2015) 238 Cal.App.4th 370, 381.) A partner's transferrable interest includes "the partner's right to receive distributions." (§ 16502.) Other provisions of section 16503 allow for the sale of a partner's transferrable interest "in whole or in part" (*id*., subd. (a)), and respondents fail to identify any section of the RUPA indicating the sale of a partner's entire transferrable interest extinguishes or impairs the preexisting rights of other transferees. Furthermore, principles of law and equity supplement the RUPA unless otherwise specified therein. (§ 16104, subd. (a).)

In true essence, respondents' theory presumes an assignor/transferor partner retains all of his or her interest in partnership profits and the assignee/transferee acquires something less than ownership of the assigned percentage. This premise conflicts with all statutory and decisional authority on the subject of assignments and transfers. Were the law as respondents suggest, section 16503 would say a transferee has the right "[t]o receive, in accordance with the transfer, distributions to which the transferor [is]

23.

entitled," rather than "would otherwise be entitled." (*Id*., subd. (b)(1).) We thus conclude respondents' reliance on section 16503 is misplaced.

Respondents further rely on certain language in the *Kozub I* judgment, namely, the word "attributable" and the referee's interpretation of the term "profits." We scrutinize this language under the previously discussed rules applicable to all writings. (*Estate of Careaga*, *supra*, 61 Cal.2d at p. 475; *Southern Pacific Pipe Lines*, *Inc. v. State Bd. of Equalization* (1993) 14 Cal.App.4th 42, 49.) "'No particular part or clause in the judgment is to be seized upon and given the power to destroy the remainder if such effect can be avoided.'" (*In re Gideon* (1958) 157 Cal.App.2d 133, 136.) If part of the judgment is ambiguous, "'the reviewing court may examine the record for its scope and effect and may look at the circumstances of its making.'" (*SLPR*, *L.L.C. v. San Diego Unified Port Dist.* (2020) 49 Cal.App.5th 284, 299.)

The first enumerated paragraph of the judgment reads: "Kozub, as Trustee of the Kozub Family Trust, and his/its successors and assigns, owns a personal property interest as an assignee of five percent (5%) of the profits attributable to Josephine's original twenty two and a half percent (22.5%) partnership interest in the [RPP] Partnership." The identity of "Josephine" is not specified, but other parts of the judgment indicate it is a reference to Margo and not Joe. Respondents place emphasis on "attributable," arguing this word indicates Kozub's economic interest in RPP is contingent upon Margo's personal entitlement to, and/or receipt of, RPP profit distributions.

Our initial focus is on the phrase "Josephine's original twenty two and a half percent (22.5%) partnership interest." It was Joe who originally held a 22.5 percent interest in the profits of RPP, but the interest was community property and therefore jointly owned by him and Margo. (See *In re Marriage of Lafkas*, *supra*, 237 Cal.App.4th at pp. 933, 937 [a partner's interest in partnership property is either separate or community property and "is considered to be 'acquired during marriage in joint form'"]; *Kenworthy v. Hadden*, *supra*, 87 Cal.App.3d at p. 701 [a wife's community property

24.

interest in husband's partnership interest is "present, existing and equal"].)  Regardless of whether it was intended in a technical or informal sense, reference to the "original" 22.5 percent interest can only mean the interest held prior to the transaction between Joe and Walter.  This is confirmed by the second enumerated paragraph, which states, "Kozub's rights as such assignee are subject to all terms and conditions of the December 27, 1974, letter agreement, a copy of which is attached … and incorporated into this Judgment."

Because Margo's transferrable interest in RPP was 21.375 percent plus whatever else she acquired from the RPP buyout of a dissociated partner, we conclude the phrase "five percent (5%) of the profits attributable to Josephine's original twenty two and a half percent (22.5%) partnership interest" is synonymous with what we have called Kozub's economic interest in RPP.  Kozub owns the interest previously sold to Walter, i.e., 5 percent of Joe's (and Margo's) original 22.5 percent interest in the partnership.  Since Margo's transferrable interest did not include Kozub's economic interest in RPP, the quoted statement cannot reasonably be interpreted to mean Kozub's rights were/are contingent upon the receipt of profits by Margo.  If anything, Kozub's rights are contingent upon the continuing existence of RPP and whether the partnership distributes profits to its partners.  (See § 16503, subd. (b)(1)–(3); see also § 16201 ["A partnership is an entity distinct from its partners"].)

Our conclusion is reinforced by the surrounding circumstances, including the timing of Margo's death in relation to the matters adjudicated in *Kozub I*.  The referee's final statement of decision dated September 18, 2013, includes this statement:  "*In the future*, Josephine will pay to Kozub, by check(s) within 30 days of the end of each calendar quarter of every year an amount equal to five percent (5%) of the profits … attributable and proportionate to Josephine's original twenty-two and a half percent (22.5%) interest in [RPP] Partnerships."  (Italics added).  The quoted statement and a list of additional obligations related to "[v]erification of the amounts [of profits payable] to Kozub" were incorporated into the fourth and fifth enumerated paragraphs of the *Kozub I*

judgment. When these rights and obligations were decreed, Margo had been dead for over 19 months and was obviously no longer receiving profit distributions from RPP.

The record indicates the referee was aware of Margo's death. In the Phase I decision, issued when Margo was still alive, he noted she was being represented by attorney Timothy Thompson. The final statement of decision, issued subsequent to her passing, says "Margaret Josephine *and her successors* have been represented by [the same attorney]." (Italics added.)

Respondents' remaining argument is based on the referee's interpretation of the term "profits." The controlling definition is set forth in the *Kozub I* judgment:

> "'Any and all receipts of cash or loan repayments under the provisions of the partnership agreement(s) by Josephine as a partner in any of the River Park limited partnership(s), successors of River Park Properties Partnership, from operations and capital events, including but not limited to refinancing transactions and sales. Except for loans and contributions to the River Park limited partnership(s) made, in which the partner increases the partner's ownership percentage by acquisition of any partner's interest, Josephine payments to the River Park limited partnership(s) in the form of loans or capital calls consistent with the partnership agreement(s) shall reduce the amount considered as distributed.'"

Respondents contend the words "Any and all receipts of cash … by Josephine as a partner … from … sales" are indicative of Margo's ability to sell Kozub's economic interest in RPP to a third party. Read in context and in its entirety, the definition of profits plainly refers to "cash or loan repayments" from "operations and capital events" *of the partnership*, "including but not limited to refinancing transactions and sales." More to the point, respondents' argument relies on the incorrect assumption Margo still owned the "original" 22.5 percent interest in RPP when she sold her transferrable interest to her trust.

The surrounding circumstances are again confirmatory. The evidentiary hearing on the meaning of "profits" was conducted in May 2013. Margo had died 15 months earlier, and her successors were litigating not only the definition of "profits" but also the question of "[w]hat procedures will be required in the future by which distributions from

26.

[RPP] are reported to [Kozub[8]] so as to enable Kozub to identify and verify the payment of any and all 'profits' to Josephine." Respondents do not explain how the second issue remained relevant and why the superior court imposed continuing reporting obligations if Kozub's right to receive a share of RPP profits was contingent upon profit distributions going to Margo as opposed to her successors/transferee(s).[9]

Following entry of the *Kozub I* judgment, accountants for RPP provided respondents with quarterly reports showing payments to be made to Kozub as "[p]er [the] Judgment dated October 9, 2013." These reports were apparently transmitted in conjunction with RPP's profit distributions. Respondent Eddie Arakelian's testimony described the reports as "breaking down what was owed to Mr. Kozub." From approximately October 2013 until the present dispute arose in November 2014, respondents sent checks to Kozub in amounts corresponding to the RPP accountants' calculations, delivering a copy of the quarterly report with each payment. The checks were signed by respondent Joy Arakelian in her capacity as trustee of the Margo Josephine Irrevocable Trust, which was identified as the payor. Respondents' conduct was entirely consistent with the rights and obligations decreed in the *Kozub I* judgment and further undermines the position they have taken in this case. (Cf. *Travelers Property*

---

[8]The final statement of decision actually refers to "Josephine," but that appears to be a mistake in light of the reporting obligations detailed on pages 4 and 5 of the same document, as well as in the *Kozub I* judgment.

[9]Respondents have alleged, without substantiation, that Margo's sale of her transferable interest to the Margo Josephine Irrevocable Trust resulted in her disassociation from RPP. However, the transfer of the entirety of a partner's transferrable interest does not automatically result in disassociation. (§ 16503, subd. (a)(1).) It only gives the partnership the option to expel the partner if all other partners unanimously agree to do so. (§ 16601, subd. (4)(B).) There is no evidence of that happening in this case. The record suggests that respondents or the trust acquired Margo's partnership rights following her death under provisions of the partnership agreement, much in the same way as Margo replaced Joe as a partner in 1987. In any event, respondents cite no authority for the proposition that disassociation or succession affects the preexisting rights of a party who has already been assigned a fraction of the partner's "right to receive [profit] distributions" (§ 16502).

*Casualty Co. of America v. Workers' Comp. Appeals Bd.* (2019) 40 Cal.App.5th 728, 739 ["the conduct of the parties is given great weight in the interpretation of a contract"].)

Based on the foregoing analysis, Kozub has demonstrated reversible error and shown his entitlement to declaratory relief.  Margo was free to sell the entirety of her transferrable interest in RPP, but the buyer acquired her interest subject to Kozub's rights under the *Kozub I* judgment.  (See Civ. Code, §§ 1589 ["A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting"], 3521 ["He who takes the benefit must bear the burden"].)  Given the merits of Kozub's primary claim, we do not address his theories of res judicata, collateral estoppel, and waiver.

## DISPOSITION

The judgment is reversed.  The trial court is directed to enter, in favor of appellant James Kozub, as Trustee of the Kozub Family Trust, a declaratory judgment consistent with this opinion.  Appellant shall recover his costs on appeal.

PEÑA, J.

WE CONCUR:

FRANSON, Acting P.J.

SMITH, J.

28.